# NO. 23-1791

In The

# United States Court Of Appeals
## For The Fourth Circuit

### LEE MARVIN HARRIS, SR.,

*Plaintiff – Appellant,*

v.

### TOWN OF SOUTHERN PINES; OFFICER JASON PERRY, Sued in his individual capacity; OFFICER SEAN LOWREY, Sued in his individual capacity; OFFICER KYLE MARSH, Sued in his individual capacity; CHIEF OF POLICE ROBERT TEMME, Sued in his official and individual capacity,

*Defendants – Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
AT GREENSBORO
_____

### BRIEF OF APPELLANT
_____

Abraham Rubert-Schewel
TIN FULTON WALKER & OWEN, PLLC
115 East Main Street
Durham, NC 27701
(919) 451-9216
schewel@tinfulton.com

*Counsel for Appellant*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __23-1791__          Caption:  Lee Marvin Harris, Sr. v. Town of Southern Pines, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Lee Marvin Harris, Sr.
(name of party/amicus)


who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.      Does party/amicus have any parent corporations?                              ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:


3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
        If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _Abraham Rubert-Schewel_          Date: ___August 15, 2023___

Counsel for: _Lee Marvin Harris Sr._

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENTS

TABLE OF AUTHORITIES ..................................................................iv

JURISDICTIONAL STATEMENT ........................................................ 1

ISSUES PRESENTED ........................................................................ 2

INTRODUCTION.................................................................................. 3

STATEMENT OF FACTS ..................................................................... 6

    A.    Lee Harris Sr. is an advocate and community leader in Moore county ............................................................................ 6

    B.    Lee Harris Sr.'s history of misconduct complaints against the Southern Pines Police Department .................... 6

    C.    SPPD initiates an investigation into Harris, Jr. and drug trafficking in Southern Pines........................................ 7

    D.    SPPD targets Harris, Jr. and his Associates.......................... 8

    E.    SPPD observes Harris, Sr. pay to have his car washed outside his mother-in-law's home .......................................... 8

    F.    Officers observe Harris, Jr. place and/or take narcotics from the Cadillac.................................................................. 12

    G.    Officer Perry's surveillance notes confirm that the officers knew that Harris, Jr., was storing narcotics in the Cadillac .......................................................................... 14

    H.    SPPD procures a warrant for Harris, Sr.'s home ................ 16

i

I.     SPPD officers execute a warrant at Harris, Sr.'s home and immediately question him about the Cadillac .............. 16

J.     SPPD omits material exculpatory evidence when seeking charges against Harris, Sr. ........................................ 20

K.     The U.S. Attorney for the Middle District adopts the prosecution of Harris, Sr. ..................................................... 22

L.     The U.S. Attorney discovers that the officers had observed Harris, Jr. placing narcotics in the Cadillac and dismisses all charges against Harris, Sr. ...................... 23

M.    Plaintiff's *Monell* allegations against the Town of Southern Pines ...................................................................... 24

N.     The district court finds the officers had probable cause to arrest Harris, Sr. .............................................................. 26

SUMMARY OF THE ARGUMENT ........................................................ 27

Standard of Review ..................................................................................... 29

ARGUMENT ................................................................................................. 30

A.     The officer's material omissions violated the Fourth Amendment ........................................................................ 30

     i.     The material facts do not give rise to probable cause ........................................................................... 33

     ii.    The officers observed Harris, Sr. at his mother-in laws home *Paying For A Car Wash* ............................. 36

     iii.   The officer's omissions were material—as evidenced by AUSA Galyon's findings ......................... 38

B. The fabricated evidence caused Harris, Sr.'s wrongful detention .................................................................................... 39

C. The officers are not entitled to qualified immunity ............. 40

D. The district court wrongly dismissed plaintiff's state law malicious prosecution claim .......................................... 41

CONCLUSION ......................................................................................... 42

STATEMENT REGARDING ORAL ARGUMENT ................................ 42

CERTIFICATE OF COMPLIANCE ...................................................... 43

CERTIFICATE OF SERVICE ............................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................ 30

*Franklin v. City of Charlotte*,
  64 F.4th 519 (4th Cir. 2023) ......................................... 29

*Howard v. City of Durham*,
  68 F.4th 934 (4th Cir. 2023) ......................................... 37

*Ker v. State of Cal.*,
  374 U.S. 23 (1963) ......................................................... 34

*Manuel v. City of Joliet, Ill.*,
  580 U.S. 357 (2017) ................................................ 29, 39

*Massey v. Ojaniit*,
  759 F.3d 343 (4th Cir. 2014) ................................. 30, 41

*Miller v. Prince George's Cnty., MD*,
  475 F.3d 621 (4th Cir. 2007) ............................... *passim*

*Taylor v. Waters*,
  81 F.3d 429 (4th Cir. 1996) ......................................... 34

*United States v. Di Re*,
  332 U.S. 581 (1948) ......................................... 29, 36, 41

*United States v. Jacobs*,
  986 F.2d 1231 (8th Cir. 1993) ...................................... 32

*United States v. Myers*,
  986 F.3d 453 (4th Cir. 2021) ................................. 35, 36

*United States v. Shorter,*
   328 F.3d 167 (4th Cir. 2003) ........................................... 35

*Ybarra v. Illinois,*
   444 U.S. 85 (1979) ........................................................... 36

**Statutes**

28 U.S.C. § 1291 ................................................................... 1

28 U.S.C. § 1331 ................................................................... 1

28 U.S.C. § 1367 ................................................................... 1

**Constitutional Provisions**

U.S. Const. amend. IV .............................................. 30, 39, 41

U.S. Const. amend. XIV ...................................................... 39

**Rules**

Fed. R. Civ. P. 56 ................................................................ 37

Fed. R. Civ. P. 56(a) .......................................................... 30

# JURISDICTIONAL STATEMENT

The district court had federal-question jurisdiction over Lee Harris, Sr.'s constitutional claims, and supplemental jurisdiction over his state-law claim. 28 U.S.C. §§ 1331, 1367.

On July 3, 2023, the district court granted summary judgment in favor of the Defendants on all claims. Harris, Sr. filed a notice of appeal on July 28, 2023. This Court has jurisdiction over a final judgment of the district court. 28 U.S.C. § 1291.

## ISSUES PRESENTED

Southern Pines Police Officers charged Lee Harris, Sr. with narcotics offenses. The officers over weeks of surveillance observed Harris, Sr.'s son placing or taking narcotics from an abandoned vehicle and dropping narcotics at a trap house. The officers had no evidence that Harris, Sr. knew of the drugs or was involved in narcotics in any way. The officers omitted these omitted material facts from the state and federal decision makers responsible for the prosecution.

Did the district court err in granting summary judgment to the officers where the record shows that the officers knowingly and deliberately omitted material facts when initiating charges against Plaintiff?

Did the district court err in holding that fabrication of evidence is not a cognizable claim to challenge pre-trial detention?

## INTRODUCTION

Southern Pines police officers watched as Lee Harris, Jr. stored narcotics in an abandoned Cadillac. They knew his father—Lee Harris, Sr., the Plaintiff—was not involved in his son's drug scheme and had no knowledge that the narcotics were in the car. Still, the officers wrongfully charged Harris, Sr., with drug crimes in attempt to force him to cooperate against his son and in retaliation for his years of advocacy on behalf of individuals involved in the justice system. The officers deliberately omitted from the charging affidavits evidence proving that Plaintiff had no involvement whatsoever in the surveilled drug activity of his son.

Plaintiff's son, Harris, Jr. was the target of a Southern Pines police investigation that began in 2017. Near the end of the year-long investigation, officers hidden in the woods surveilled Harris, Jr. as he traveled to his parents' home and surreptitiously picked up narcotics stored in an inoperable, tarp-covered Cadillac which sat at the back edge of his parent's property and then delivered them to a "trap house" where he was selling drugs.

Over the next month, the officers tracked the son's movements through GPS and occasional in-person surveillance. The officers' notes

repeatedly document the son going from the car behind his parent's home to the trap house where they observed him deliver narcotics. At no time did the officers observe Harris, Sr. or his wife go near the abandoned vehicle.

On the final day of the investigation, a GPS tracker recorded the son traveling from a storage locker where cocaine was later recovered to his parents' home. The son was then surveilled meeting with a Hispanic male in a Lowe's parking lot who was arrested that day for trafficking cocaine and who confessed to being the son's supplier.

Later that afternoon, Southern Pines' police officers executed a search warrant at Plaintiff's home and went directly to search the Cadillac where they had observed the son retrieve narcotics. Officers found cocaine in the vehicle packaged in an identical manner as the cocaine found at the home of the son's supplier. Following the search, the officers charged the son with numerous narcotics offenses but charged Plaintiff with possession of the drugs discovered in the vehicle.

When presenting their charging request to the magistrate, district attorney, and federal prosecutors, the officers intentionally omitted any mention of their surveillance of the son, including that they had observed

him storing and retrieving drugs from the car, and failed to inform the decision makers that they had *never seen* Plaintiff near the car during the weeks of surveillance.

Contrary to the findings of the district court, the narcotics were not in plain view but were located under a tarp-covered car, inside an armrest of the inoperable vehicle; and were never under the joint control of the father and son. They were hidden there, and then secreted away, solely by the son without any evidence of any knowledge, let alone approval, by Plaintiff.

Once these omitted details were discovered by the U.S. Attorney who had adopted the state prosecution, he dismissed all charges against Harris, Sr., and authored a Rule 11 memorandum confirming the son was responsible for the narcotics in the vehicle. As a result of the officer's actions, Harris, Sr. spent approximately six months in state pre-trial detention and then another 8 days in federal detention.

Taking all facts and inferences in Harris, Sr.'s favor, a reasonable juror could conclude that the officers charged Plaintiff falsely with narcotics offenses. And, because the officers withheld material information from state and federal prosecutors and court officials, a reasonable juror could also find the officers fabricated evidence that caused his detention.

This Court should reverse the decision of the district court and remand for trial on all of Plaintiff's claims.

## STATEMENT OF FACTS

**A.    Lee Harris Sr. is an advocate and community leader in Moore county.**

Appellant-Plaintiff Lee Marvin Harris, Sr. is a 63-year old disabled veteran of the United States Armed Services. JA114. He is an ordained minister and has served for many years as an elder at New Jeruslem Missionary Baptist Church. JA115. He also worked for the North Carolina Department of Corrections as a corrections officer from 1993 to 2000. JA113.

On multiple occasions, Harris, Sr. has assisted Moore county community members with presenting and investigating citizen complaints against law enforcement officials and has helped individuals navigate the criminal justice system. JA116-117.

**B.    Lee Harris Sr.'s history of misconduct complaints against the Southern Pines Police Department.**

Harris, Sr.'s advocacy involving the Southern Pines Police Department ("SPPD") dates back as early as 2007. JA116-118. In the ten years leading up to the arrest challenged as unconstitutional in this

suit, Harris, Sr. had numerous interactions with the SPPD, including lodging formal complaints against Officer Jason Perry. *Id*.

One one occasion in 2013, Harris, Sr. encountered Officer Perry investigating a drug offense at a neighbor's home. JA258. Harris, Sr. accused Officer Perry of harassing his neighbors and possibly planting narcotics at the residence. *Id*. In response, Officer Perry ran towards Harris, Sr. and "stopped right directly in [his] face and yelled, [y]ou leave right now, go!" *Id*. Because of this incident, Harris, Sr. filed an "Assault Complaint" with the SPPD. *Id*. In it he alleged that Officer Perry assaulted him, and that he was a "bad apple and does law enforcement no justice in keeping him on the police force." *Id*.

## C.    SPPD initiates an investigation into Harris, Jr. and drug trafficking in Southern Pines.

In 2017, Officers Perry and Lowery began an investigation into drug trafficking in Southern Pines entitled "Operation Leader". JA124-125. Lieutenant Marsh was the supervisor in charge of the investigation. JA161. As early as February of 2017, SPPD "conducted surveillance on multiple residences through primarily Southern Pines, West New York Avenue, West Indiana Avenue." JA234. According to Officer Perry, the officers "did wood surveillance for a period of time.

Wood surveillance led to pole camera surveillance. That led to [GPS] tracker surveillance." JA215.

### D.  SPPD targets Harris, Jr. and his Associates.

In December of 2017, Officer Perry received information from an informant that Plaintiff's son, Harris, Jr. was the leader of a group referred to as the "Dope Boy Clic" or "DBC". JA194-196. The DBC members "involved Lee Harris, Jr., Christian Terry, Lamar Sealy, and some other ones that were not arrested on that day." JA172. Harris, Sr was never was never identified or suspected as a member of the "Dope Boy Clic" or a "target" of Operation Leader. JA177.

### E.  SPPD observes Harris, Sr. pay to have his car washed outside his mother-in-law's home.

One of the locations surveilled by Officers Lowery, Perry and Marsh was an abandoned house located at 811 W. New York. JA173. In addition to in-person surveillance, the officers utilized a "pole camera" placed in the woods outside of 811 W. New York. JA173. Officers Perry and Lowery both knew that Harris, Sr.'s "mother-in law lived next-door" to 811 W. New York. JA122-123; JA178. The below photo is of 823 W. New York, the grey house on the left—Plaintiff's mother-in-law's home.

The surveilled location, 811 W. New York is the white house on the right. *See* Ex. 32.[1]



In a declaration written in support of his motion for summary judgement, Officer Perry claimed that at some point during the surveillance of 811 W. New York Ave he observed Harris, Sr. handing

---

[1] All photo and video exhibits are available in the digital exhibits section of the joint appendix.

"cash" to a "local drug dealer". JA39.[2] Officer Perry testified at his deposition that Harris, Sr. handed money to Robert McRae. JA140. Importantly, Officer Perry also testified that *he knew at the time of the surveillance* that McRae owned a car wash business. *Id*.

The SPPD pole camera took multiple surveillance videos on this date. The first two videos show Harris, Sr. arriving at his mother-in-law's home in his silver truck and standing in her yard as he appears to wait for someone. Ex. 15 at 0:00-0:10 (Video 00000). McRae's Black SUV then arrives at the intersection with cleaning equptment and supplies in a trailer attached to his vehicle. Ex. 17 at 0:00-1:30 (Video 00002). Below is a screen shot from Video 00002.

---

[2] Officer Perry did not mention this "hand-to-hand" transaction in the warrant application to search Harris, Sr.'s home (JA192-205) and it is not listed in any state or federal charging documents or reports. This transaction did not come to light until Defendants answered Plaintiff's civil suit. Officer Perry was unsure whether he observed this transaction on surveillance video or in person and also never stated when this transaction or surveillance occurred. JA140-141.



Approximately 40 seconds into Video 00002, Harris, Sr. moves his silver truck in front of 811 W. New York and McRae then positions his SUV so it is directly in front of the truck. *Id.* Next, Video 00018 shows Harris, Sr. speak with McRae, hand him two bills of United States currency, and then walk out of the screen. Ex. 16. at 00:20-1:05. Seconds later, Harris, Sr.'s silver truck reappears in the frame, now with brightly cleaned tires and a shined exterior. *Id.* at 1:45. Harris, Sr. then parks his truck in front of his mother-in law's home. *Id.* It had clearly been washed.

### F. Officers observe the son place and/or take narcotics from the Cadillac.

Near the end of their investigation, the SPPD officers conducted in-person wood surveillance at Plaintiff's home at 803 N. Sycamore Street. JA241. On January 24, 2018, Officer Lowery observed the son arrive at at 803 N. Sycamore St, and wrote that "Lee Jr [] goes to the rear of the home, out of sight and there for approximately 2 to 3 minutes." *Id.* Photos taken by SPPD show that the Cadillac was parked behind a trailer behind the home. Ex. 20, 21.





The following day, Officer Lowery surveilled the home, and noted that "Lee Jr then goes to the front right edge of the property and is placing or retreiving something from underneath a tarped item located to the right of the enclosed trailer." JA241.

Less than a week later, on January 31, 2018, Officer Lowery again conducted wooded surveillance at 803 N. Sycamore Street. JA242. Lowery wrote: "Lee Jr, wearing a black jacket with a hood that was pulled over his head, gets out of his car and goes to the right side of the home, near a silver in color enclosed trailer. He then approaches a vehicle covered with a blue tarp on it. He is over at this vehicle approximately 2 to 3 minutes. Lee Jr then goes inside the home using the front door, for 1-2 minutes, comes back out of the house and gets back in the Venza." *Id*.

Officer Perry testified that he reviewed and spoke with Officer Lowery about the contents of his surveillance notes. JA137.

### G. Officer Perry's surveillance notes confirm that the officers knew that Harris, Jr., was storing narcotics in the Cadillac.

Officer Perry kept handwritten notes from his in-person surveillance and the GPS trackers that were placed on the son's vehicles. JA147-149. These notes documented Harris, Jr.'s movements as he traveled around town, including before and after going to his parent's house. JA265-303.

On January 24, 2018—the same date Officer Lowery conducted wooded surveillance and observed Harris, Jr. going to the rear of the home where the car sat—Officer Perry's notes document that at 16:43 the son arrived at his parent's home and that he left at 17:00. JA280-281. Ten minutes later, Perry's notes state that Harris, Jr. arrived at "T.H." and dropped "dope at stop sign." *Id.* On a separate page, Officer Perry noted with more specificity "1/24/18 1643 hrs. Dads → T.H. → drop dope @ T.H." JA267.

On January 25, 2018—the next day, with Officer Lowery again surveilling Harris, Jr. from the woods and observing him "placing or

retrieving something from underneath a tarped item" (JA241)—Officer Perry documented the son arriving at his parent's home at 12:22 and leaving by 12:28. JA282. Thirteen minutes later, Officer Perry's notes state that Harris, Jr. arrived at "T.H." and again dropped the "dope at left side T.H." *Id.*

On January 31, 2018—as Officer Lowery conducted wooded surveillance—Officer Perry tracked Harris, Jr. as he arrived at his parent's home at 15:09 and went "to the tarp." JA284-285. Roughly forty minutes later, Harris, Jr. arrived at the "T.H.".

Over the next twenty days, Officer Perry's notes show that he continued to track the son's movements through GPS surveillance and occasional in-person surveillance at the trap house. These notes repeatedly document Harris, Jr. driving from his parent's home—where the officers knew he was storing narcotics in the abandoned vehicle—to the trap house to deliver narcotics. JA285-300.

On February 20, 2018, at 11:25 a.m.—the day the warrant was executed, and cocaine was discovered in the Cadillac—Officer Perry's GPS tracker recorded Harris, Jr. traveling from a storage locker in Aberdeen, where cocaine was later recovered, to his parent's home. JA300.

**H.    SPPD procures a warrant for Harris, Sr.'s home.**

Approximately three weeks after the visual surveillance of the son placing or taking narcotics from the tarp-covered Cadillac, Officer Perry applied for a search warrant of his parent's home. JA142; JA192-205.

In the warrant applicaton, Officer Perry stated that when present in "Moore County," Harris, Jr. "resides at 803 N Sycamore St., Aberdeen NC 28315 (Residence of Lee Marvin Harris Sr.)." JA199. Officer Perry wrote that his parent's home is the sons "most frequented area during the daytime and nightime while in the Moore County area." *Id*. Harris, Sr. was never mentioned in the warrant application as a suspected drug-trafficker or to have ever been surveilled while involved in any drug transaction. *Id*.

**I.    SPPD officers execute a warrant at Harris, Sr.'s home and immediately question him about the Cadillac.**

On February 20, 2018, SPPD officers were granted a search warrant for Harris, Sr. and his wife's residence at 803 N. Sycamore Street. JA142. Prior to the execution of the warrant, Officer Perry met with Officers Lowery, Marsh and officers on the special response team. JA142-143. The officers decided that Officer Perry would go to Harris,

Sr.'s home while Lowery would lead the warrant execution at 1090 W. Indiana, a location where officers had observed narcotics sales. *Id.*

Upon making entry into Harris, Sr.'s home, Officer Perry handcuffed him and placed him in his squad car for an interview. JA144-145. Officer Perry was not present for the search of the covered Cadillac and does not recall where the cocaine was located, but stated that at the time of the interview, Harris Sr. was not under arrest. *Id.*

Officer Perry questioned Harris, Sr. repeatedly as to whether Harris, Jr. had ever brought drugs to his house. JA145-146. Officer Perry stated to Harris, Sr. that "[t]hings have happened that have come directly from this house." JA151. Harris, Sr. told Perry "I don't do dope. I don't curse. I don't drink liqour . . . I don't even smoke cigarettes." JA145.

Officer Perry then began to question Harris, Sr. about the Cadillac and if he had the keys to the vehicle. JA153. Notably, Officer Perry did not ask Harris, Sr. if he had the keys to his truck which was parked in the drive way, or to the storage shed in his yard. JA153-155. Officer Perry later asked whether "there [is] any place around your house that your son goes on a regular basis that is kind of strange?" JA139.

As Officer Perry questioned Harris, Sr. in his squad car, Officer Marsh searched and discovered cocaine in the rear armrest of the Cadillac. JA169; JA156-157. The officers learned that the Cadillac was not operational, had no battery, and the registration had expired in 2015. JA168 ("I believe the registration was expired); JA237 ("the vehicle did not have a battery installed in it so it was not operable"); JA256; Ex. 35, SPPD Photo of Expired Tags and Registration.

After his interview, Officer Marsh claimed that "Mr. Harris walked with me into his home, into the northern most bedroom, to a hanger on the wall, and provided me a key that was hanging from this location." JA263. Harris, Sr. testified at his deposition that he did not "hand [Marsh] any keys" but showed him "where my key rack was." JA119. Officer Marsh claimed that "[t]hese keys did in fact turn the ignition on, and operated the locks on the doors . . ." JA263. On September 22, 2022, the parties tested the keys on the Cadillac. *See* Ex. 39, Video Keys Test. None of the keys fit or turned the door locks. *Id.* One of the keys was able to fit into the ignition and turn it. *Id.*

Importantly, this key rack (pictured below) was located on the outside of Harris, Sr.'s and his wife's bedroom door—not in the bedroom

as claimed by Officer Marsh—and was accessible to any of the members of the household including Harris Jr., when he stayed there. JA119-120; Ex. 41, Key Rack on Door. Still, at both state and federal bond hearings Officer Perry falsely testified that the keys to the vehicle were discovered inside Harris, Sr.'s bedroom. JA210; JA237.



Harris, Sr. was placed under arrest for possession of cocaine and transferred to the SPPD. JA179. Officers Marsh and Perry debriefed Officer Lowery and told him that cocaine was recovered in a "red cadillac" located "to the right of the property." *Id.* Officer Lowery, with input and oversight from Officers Marsh and Perry, drafted the

Magistrate's order charging Harris, Sr. with possession and trafficking cocaine. JA180-183; JA219-220.

While conducting the search of Plaintiff's home, officers were also executing a warrant at the home of a "hispanic male" who was known as Harris, Jr.'s supplier. JA208-209. SPPD officers surveilled the hispanic male meeting with Harris, Jr. on multiple occasions, including the day of the search. JA209. The cocaine located at the hispanic male's residence was packaged identically to the cocaine discovered in the covered Cadillac. JA211.

No narcotics, cash or paraphernalia were discovered inside Harris, Sr.'s home. JA263.

### J.    SPPD omits material exculpatory evidence when seeking charges against Harris, Sr.

At the Moore County Jail, Officer Lowery swore out the allegations in the Magistrate's Order—that he had drafted—to Magistrate Carol Wright. JA187-189. Officer Lowery, when speaking to Magistrate Wright, did not inform her that he had observed Harris, Jr. placing or taking items from the Cadillac just three weeks prior. JA189; JA219-220.

So as I understand what you're asking me, you're asking me that -- did I tell the magistrate at that point that it was the same vehicle that I observed several weeks prior, that you're saying that I stated into a note or made notes about where Junior was going? No, I -- I would not tell the magistrate that.

JA189. Officer Lowery also failed to inform her that on multiple occasions in the weeks leading up to the search that surveillance showed the son taking narcotics from the Cadillac and then dropping them at the trap house. JA282-285. And that on the morning of the search, GPS tracking showed Harris, Jr. had traveled from the storage locker where cocaine was found to his father's residence. JA300. Finally, Lowery failed to inform Magistrate Wright that the vehicle was inoperable, had no battery and no active registration. JA168; JA237. In fact, Officer Perry, at a later state bond hearing, falsely testified the Cadillac had a "valid registration" at the time the drugs were located. JA238.

Magistrate Wright charged and detained Harris, Sr., JA219-220, based on a finding of probable cause that Harris, Sr. "knowingly and intentionally" maintained a vehicle for the purpose of "keeping and selling" a controlled substance. *Id*. The Magistrate set his bond at an astounding $5,000,000. JA243.

Similarly, the officers did not inform the District Attorney Warren McSweeney that they had observed Harris, Jr. place or take narcotics from the Cadillac. JA306. And they admitted to omitting this fact about observing the son when they testified in the state grand jury. JA129-130.

In their brief submitted to the district court in support of summary judgement, the officers claimed that they provided all details they knew to the district attorney and federal prosecutors in their "prosecution summary." The officers' signatures on the prosecution summary and "certificate of compliance" submitted to the state, however, are dated March 19, 2018, nearly a month after Harris, Sr.'s state arrest and two weeks after he was indicted. JA307. No one from the state prosecutor's office signed the summary indicating that they had received discovery. *Id.*

### K.    The U.S. Attorney for the Middle District adopts the prosecution of Harris, Sr.

On August 2, 2018, all of Harris, Sr.'s state charges were dismissed after he was indicted federally. JA75. Officers Perry and Lowery spoke with AUSA Joanna McFadden prior to the federal indictment of Plaintiff. JA127-128. In his discussions with AUSA McFadden, Officer Perry again omitted the fact that SPPD officers had observed *only*

Harris, Jr. appear to place or take narcotics from the Cadillac in the weeks prior to the warrant execution. JA124; JA129-130.

Officer Perry "eventually" provided the U.S. Attorney's office with the prosecution summary, but was unsure if this occurred before or after Harris, Sr. was indicted. JA128. Officer Perry was scheduled to testify in the federal grand jury, but could not recall if he gave testimony. JA129; JA249. Officer Lowery testified in the federal grand jury. JA185-186.

### L. The U.S. Attorney discovers that the officers had observed Harris, Jr. placing narcotics in the Cadillac and dismisses all charges against Harris, Sr.

AUSA Randall Galyon took over the federal prosecution when AUSA McFadden went on maternity leave. JA127. Galyon met with Officer Perry and reviewed the evidence against Harris, Sr. and, on December 14, 2020, dismissed all charges against him. *Id*: JA126-127; JA206.

Three days before dismissing the charges, AUSA Galyon filed a Rule 11 Memorandum in the case against Harris, Jr. JA221. The memorandum discusses the SPPD officers' surveillance in detail and confirms that they observed only Harris, Jr. appear to place or take items from the covered Cadillac:

On or about January 25 and January 31, 2018, officers surveilled the residence at 803 Sycamore Street, Aberdeen, NC. Harris Jr.'s parents live at the Sycamore Street residence, and Harris Jr. often stayed at the residence during 2017 and 2018.

On both surveillance occasions, Harris Jr. arrived at the residence and then went over to a Cadillac covered with a gray car cover for a few minutes, consistent with placing and item in or retrieving an item from the vehicle. Powder cocaine and crack cocaine were later recovered from that covered Cadillac on February 20, 2018, pursuant to a search warrant.

JA222.

Officer Perry stated that the "only way they [the U.S. Attorneys] would receive this information" would have been from him or Officer Lowery. JA131. Officer Perry agreed that the statements in the Rule 11 memorandum "entirely contradicted" his and Lowery's own testimony that they had never observed the son place or take items from the covered Cadillac. JA132-133.

## M.     Plaintiff's *Monell* allegations against the Town of Southern Pines.

At the time of Harris, Sr.'s arrest he was told by multiple officers that this investigation was not about him but was about his son. JA120 ("Marsh told me to tell you that if you didn't cooperate with him . . . about your son he was gonna take you to jail and lock you up."); *see also* JA145.

Plaintiffs' arrest and prosecution is just one of many where Officer Perry has attempted to coerce individuals to falsely testify against others through wrongful arrests or the threat of arrest. This includes the case of Martha Dickerson, who was arrested in 2013 by Officer Perry, because her son was alleged to be involved in narcotics trafficking. JA229-230. Despite Mrs. Dickerson having no involvement with drug activity and never possessing any drugs she was charged with possession of narcotics. *Id*. All charges against Mrs. Dickerson were later dismissed. *Id*. Jason Perry told Ms. Dickerson, "We are working on you to get to your son." *Id*.

On a second occasion, Officer Perry attempted to coerce a potential witness, Tracy Williams, to become an informant under the false threat of arrest. Officer Perry told Ms. Williams that she needed to provide information to help herself because of her "criminal record" and asked her, "do you know Stretch and Lil Dee and have you ever bought drugs from them?" JA261-262. He asked her to buy drugs from alleged dealers in the area, to wear a wire and camera, and stated that if she did not she would "spend a lot of time in prison." *Id*. Finally, when she refused to cooperate, Officer Perry stated "[d]on't tell nobody I called you erase every message." *Id*.

On a third occasion, Officer Perry approached an individual named Arthur Darby and attempted to coerce him into providing false information. JA104-105. Officer Perry confronted Darby at least twice, offering him $50.00 to provide information. *Id*. Even after Darby repeatedly told him that he did not have any information to provide, Officer Perry made "numerous attempts to coerce [Darby] into falsifying evidence to help build his cases." *Id*. On March 05, 2013, Arthur Darby filed a *pro se* civil action against Officer Jason Perry and the Southern Pines Police Department for based on Darby's description, being accused of a crime, illegally interrogated, mentally coerced, and his civil rights violated. JA106-109.

## N. The district court finds the officers had probable cause to arrest Harris, Sr.

After dismissal of his state and federal charges, Harris, Sr. initiated this action. In the main, he asserted that the officers prosecuted him without probable cause and that the officers fabricated evidence that caused his detention.

The defendants moved for and were awarded summary judgment on all claims. The district court held that Plaintiff's "malicious prosecution" claim failed because the officers had probable cause for his

arrest. JA327. In reaching its conclusion, the district court relied heavily on constructive possession precedent and the combination of the discovery of narcotics in the covered vehicle along with surveillance of "Plaintiff engaging in a hand-to-hand cash transaction with a known drug distributor." JA336. For the same reasons, the district court found the officers were also entitled to qualified immunity on the malicious prosecution claim. JA345.

The district court also granted summary judgement on Harris, Sr.'s fabrication of evidence claim. The court held that Plaintiff's loss of liberty in the form of pre-trial detention was insufficient to establish a claim. "The Fourth Circuit has only recognized a fabrication of evidence claim when that fabrication of evidence resulted in a criminal conviction, not pretrial detention." JA348.

Harris, Sr. timely appealed. JA359.

## SUMMARY OF THE ARGUMENT

Officers Perry and Lowery knew that Harris, Jr. was solely responsible for the narcotics discovered in the Cadillac. The officers repeatedly  surveilled the son going to the abandoned Cadillac and appearing to place or take narcotics from the vehicle. They then

tracked the son as he left his parent's home and minutes later observed him drop off narcotics at a known trap house. On the date of the warrant execution, the officers recorded the son traveling from a storage locker in Aberdeen where cocaine was later recovered to his parent's home. As expected, the narcotics found in the Cadillac were marked and packaged identically as the drugs recovered from the son's supplier.

The officers never observed Harris, Sr. going near or around the abandoned Cadillac, the only location that drugs were found or possible drug activity was observed. The officers—knowing the above information was crucial—hid these facts from the magistrate, district attorney, grand jury, and the United States Attorney. Indeed, when those facts were finally revealed to a prosecutor, all charges against Harris, Sr. were immediately dismissed.

Taking this evidence in the light most favorable to the Plaintiff at summary judgment, a jury could certainly conclude that the officers knowingly and deliberately omitted material information that caused Harris, Sr.'s wrongful prosecution. *Miller v. Prince George's Cnty., MD,* 475 F.3d 621 (4th Cir. 2007). Likewise, a jury could also find that the

officers' fabrications and omissions caused Plaintiff's detention. *Manuel v. City of Joliet, Ill.*, 580 U.S. 357 (2017).

Finally—when all of the material facts are considered—the district court erred in holding that the officer's had probable cause to arrest Harris, Sr. for constructive possession or under any other theory of prosecution. The narcotics were discovered inside the armrest of an abandoned car that sat under a protective cover, with no battery, and that had not driven or been registered to anyone in years. Despite their extensive surveillance the officers had no evidence that Harris, Sr. had gone anywhere near the Cadillac. In fact—as proven through their surveillance notes—they had already "single[d] out" Harris, Jr. as the responsible party for the narcotics. *United States v. Di Re*, 332 U.S. 581, 594 (1948) (finding that any inference of constructive possession dissipates when the government singles out one individual as the guilty party).

This Court should reverse the district court's order and remand this case for a trial by jury.

### Standard of Review

This Court reviews rulings on summary judgment *de novo*. *Franklin v. City of Charlotte,* 64 F.4th 519 (4th Cir. 2023). Summary

judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court's function is not to decide the truth of the matter but "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986). Therefore, to determine whether genuine disputes of material fact exist, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## ARGUMENT

### A. The officer's material omissions violated the Fourth Amendment.

The SPPD officer's willful material omissions and misrepresentations caused Harris, Sr.'s wrongful prosecution and detention. An officer's omissions violate the Fourth Amendment if they are both "material, that is, necessary to the finding of probable cause," and "made deliberately or with a reckless disregard for the truth." *Massey v. Ojaniit*, 759 F.3d 343, 357 (4th Cir. 2014) (internal quotation marks omitted).

Over fifteen years ago, in *Miller v. Prince George's Cnty., MD,* 475 F.3d 621, 629 (4th Cir. 2007), this Court examined an affidavit and arrest warrant that incorrectly named an individual as a suspect in a burglary. The affidavit listed an African American individual, named Miller. The Plaintiff argued that the officer, after his investigation, knew or should have known that the actual suspect was actually a white male—of the same name—but omitted this information from the affidavit. This Court held that when viewed "in the light most favorable to Plaintiff, a reasonable jury could certainly conclude that the affidavit submitted by [the detective] contained misrepresentations and omissions made deliberately or with reckless disregard for whether they thereby made[ ] the affidavit misleading." And that the detective, when "viewing all the evidence ... must have entertained serious doubts as to ... the accuracy of the information he reported." *Id.* (internal citations omitted). In *Miller,* the Court found the omissions to be "material", because "an affidavit containing the omitted material and stripped of all misrepresentations" would not have provided probable cause to arrest Plaintiff. *Id.*

Here, Harris, Sr. contends the same. Officer's Perry and Lowery admit that they did not disclose to the magistrate, state prosecutors,

state grand jury, or federal prosecutors that they had monitored the son on multiple occasions, via live surveillance and GPS, as he surreptitiously picked up narcotics from the Cadillac and then dropped them at a known trap house. The officers also failed to inform these state and federal decision makers that the Cadillac was inoperable, had no battery and no active registration, and that the narcotics found in the vehicle had the identical markings as the narcotics discovered on the son's supplier.

Because the officers "failed to inform the judicial officer of facts [they] knew would negate probable cause" their omissions were made with reckless disregard for the truth and its effect on the affidavit. *Miller,* 475 F.3d at 627; *see also United States v. Jacobs*, 986 F.2d 1231, 1234–35 (8th Cir. 1993) ("[T]he omission occurred at least with reckless disregard of its effect upon the affidavit.... Any reasonable person would have known that this was the kind of thing the judge would wish to know."). Officers Perry and Lowery both admit that they intentionally withheld this information, and at their depositions—even when confronted with their own surveillance notes—repeatedly denied that they had observed the son picking up narcotics from the covered vehicle. JA124-131.

Finally, when viewed in the light most favorable to the Plaintiff, a reasonable jury could conclude that an affidavit containing the material omissions and stripped of all misrepresentations would not have provided probable cause to arrest Harris, Sr. *Miller v. Prince George's Cnty., MD,* 475 F.3d 621, 627–28 (4th Cir. 2007) ("To determine materiality, a court must excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause."). As explained in detail below, because the officers knew that Harris, Jr. was using the abandoned car as a place to store his drugs and had no evidence that Harris, Sr. had control or knowledge of the narcotics—the material facts do not give rise to probable cause under constructive possession or any other theory.

i. **The material facts do not give rise to probable cause.**

The district court found that "Defendants may have known from their surveillance that Harris, Jr." appeared to place or take narcotics from the Cadillac but held that knowledge did not negate the "reasonable belief that Plaintiff also had possession of the drugs found in the Cadillac." JA342. In reaching its conclusion, the district court misapplied appellate precedent related to the plain view doctrine and constructive

possession. The court also ignored the clear evidence that the son was the sole source of the narcotics.

*First*, the narcotics were not discovered in plain view. The inoperable Cadillac sat abandoned on the edge of the property under a tarp. The drugs were discovered *inside* the rear arm rest. JA169-170; JA210. *Ker v. State of Cal.,* 374 U.S. 23, 36, (1963) and *Taylor v. Waters*, 81 F.3d 429, 435 (4th Cir. 1996) are inapposite: both are cases where narcotics or packaging were prominently displayed inside of a shared home. Not so here. The police had no evidence that Harris, Sr. had been inside or used the inoperable, unregistered car in years.

*Second*, Harris, Sr. did not constructively possess the narcotics. The cocaine was found inside an arm rest of a vehicle on the edge of Harris, Sr. and his wife's property. The vehicle had a protective cover, no battery, had not been driven or registered in at least three years and the front door opened without a key during the search. JA263. And, on multiple occasions surveilling the home, officers had never seen Harris, Sr. go near the covered vehicle—but had seen the son place or take narcotics from the vehicle—facts they concealed from the magistrate, district attorney and United States Attorney.

The constructive possession cases cited by the district court are far afield from the facts here. In *United States v. Shorter*, 328 F.3d 167, 172 (4th Cir. 2003), marijuana was located in plain view in the living room in the home where Shorter lived. The firearms he was charged with were not in plain view, but ammunition for one of the guns was in the living room, and a gun holster was in Shorter's closet. *Id.* Shorter also had a history of drug offenses. In contrast, here the officers located no evidence of narcotic possession, cash, or distribution inside the home, and Harris, Sr.—in his 62 years—had no prior arrests or convictions.

In *United States v. Myers,* 986 F.3d 453, 457 (4th Cir. 2021), officers observed a vehicle pick up an individual exiting a bus (at a known drug entry point) after a short phone call. Police pulled the vehicle over and smelled a strong odor of marijuana. *Id.* They then searched the vehicle and the individuals and located $1,800 on the passenger and three cell phones and loaded gun on the driver. *Id.* 300 grams of fentanyl were discovered behind the passenger seat on the floorboard. *Id.* The driver and passenger were charged with possession of the narcotics, "which was readily accessible to both." *Id.* Again, in the case before the Court, no evidence of narcotics or any contraband were found on Harris, Sr., or in

his home, but the drugs were discovered in an outside location where the officers had observed only the son furtively storing narcotics.

The facts before this Court align much closer to the cases distinguished by the Fourth Circuit in *Myers.* As the Court explained, *Myers* was not a case where "mere propinquity to others independently suspected of criminal activity is advanced as the basis for probable cause." *Myers,* 986 F.3d at 458 (*citing Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). Or, "where one individual present in an automobile with the defendant has been 'single[d] out' as the guilty person, effectively exculpating the defendant." *Myers,* 986 F.3d at 458 (*citing United States v. Di Re*, 332 U.S. 581, 594 (1948)). Here, a jury could find that both circumstances were true—and that the officers relied on "mere propinquity" and had in fact "singled out" the son, and thus lacked probable cause to arrest Harris, Sr.

### ii. The officers observed Harris, Sr. at his mother-in laws home *Paying For A Car Wash.*

The district court found that the combination of narcotics found in the inoperable car and "surveillance of Plaintiff engaging in a hand-to-hand cash transaction with a known drug distributor provides ample evidence" supported probable cause for arrest. JA336. This assertion

ignores material facts that, when viewed in the light most favorable to the Plaintiff, give rise to claim of fabrication of evidence by Officer Perry, and not probable cause to arrest. *Howard v. City of Durham*, 68 F.4th 934, 949 (4th Cir. 2023) ("Rule 56 demands that we avoid simply accepting [defendants] self-serving statements and ... consider *all* contradictory evidence.") (internal quotations omitted).

As explained above in detail, the video footage allegedly showing a "hand to hand" transaction with a known drug dealer, is actually footage of Harris, Sr. paying Robert McRae (a "known" mobile car washer) for washing and detailing his truck next to Harris, Sr.'s mother-in-law's residence. Officer Perry, at the time he observed the payment, testified that he knew that McRae owned a car wash business and also knew that Harris, Sr.'s mother-in law lived in the house next door to where his car was cleaned and detailed. Moreover, the surveillance footage shows McRae arriving in a black SUV with *cleaning equipment and supplies in a trailer*. The video next shows Harris, Sr. pay McRae and drive off in his sparkling cleaned truck. The surveillance shows no evidence of any narcotics exchange—but, when viewed in a light most favorable to the Plaintiff—shows payment for washing his car.

Notably, the officers did not mention this car wash payment in *any* investigatory paperwork or warrant application or provide it to the magistrate at the time of arrest. This accusation did not surface until Defendants' filed their Answer to Plaintiff's civil suit. In sum, officer Perry's "self-serving" allegation at most rises to a dispute of material fact that should be resolved by a jury.

### iii. The officer's omissions were material—as evidenced by AUSA Galyon's findings.

A reasonable jury could find that once the above listed omissions and fabrications are considered, the officer's lacked probable cause to charge Plaintiff. The clearest indication of this result is the Rule 11 memorandum filed by the U.S. Attorney's Office in support of Harris, Jr.'s plea agreement. JA221. In it, AUSA Galyon reviews the SPPD officers' surveillance in detail and confirms that they observed *only* Harris, Jr. place or retrieve items from the Cadillac where the narcotics were later discovered. Three days after writing this memorandum, AUSA Galyon dismissed all charges against Harris, Sr.

## B. The fabricated evidence caused Harris, Sr.'s wrongful detention.

The Supreme Court recognized in *Manuel v. City of Joliet, Ill.*, 580 U.S. 357 (2017) a claim where the Plaintiff sought relief for "his (post-legal-process) pretrial detention" based on fabricated evidence. In *Manuel* the Plaintiff was arrested based "solely on his possession of pills that had field tested negative for an illegal substance" *Id.* A judge found probable cause—based on the officer's allegation of possession of narcotics—and ordered the Plaintiff detained pending trial. *Id.* Because the judge relied on the officer's "fabrications", the Plaintiff was able to able to bring a claim challenging his "wrongful detention." *Id.* "Legal process did not expunge [Plaintiff's] Fourth Amendment claim because the process he received failed to establish what that Amendment makes essential for pretrial detention—probable cause to believe he committed a crime."

Here, Harris, Sr. makes the same claim. Officer Defendants Perry, Lowery and Marsh, fabricated evidence which caused Plaintiffs' wrongful *pre-trial detention*. As explained in detail in the brief filed by *amicus curiae*, the National Police Accountability Project, numerous other Circuit Courts of Appeal have recognized such a claim under the Fourth and Fourteenth Amendments.

Defendants' fabrications through false statements and material omissions and fabrications include, (1) that the officers omitted evidence that Harris, Jr. was the only person surveilled on numerous occasions placing or taking items from the Cadillac, after which he dropped off narcotics at a trap house; (2) the officers fabricated information that the registration on the Cadillac was active; (3) the officers omitted that the cocaine found in the Cadillac matched the packaging and marking of cocaine recovered from the supplier of the son; (4) the officers fabricated evidence that the keys to the inoperable car were in the father's bedroom when they were actually located in a common area in the household that anyone could access.

By withholding this information from the state and federal decision makers, the Defendant officers caused Plaintiffs' wrongful detention.

## C. The officers are not entitled to qualified immunity.

Relying on constructive possession and plain view precedent, the district court held that the Defendants were entitled to qualified immunity on "Plaintiff's malicious prosecution claim". JA344.

The district court erred in this finding. This Court has clearly established that omissions or false statements violate the Fourth Amendment if they are both "material, that is, necessary to the finding of probable cause," and "made deliberately or with a reckless disregard for the truth." *Massey v. Ojaniit*, 759 F.3d 343, 357 (4th Cir. 2014) (internal quotation marks omitted); *see also Miller v. Prince George's Cnty., MD,* 475 F.3d 621, 629 (4th Cir. 2007).

As explained above, this is the exact argument made by Plaintiff. The defendant officers intentionally or recklessly hid material evidence from state and federal decision makers. And, when viewed in the light most favorable to the Plaintiff, a reasonable jury could conclude that a warrant or affidavit containing the omissions and stripped of all misrepresentations would not have provided probable cause to arrest Harris, Sr. Like in *United States v. Di Re*, 332 U.S. 581, 594 (1948), once the son had been "singled out" as the liable party, the officers were not entitled to arrest Harris, Sr. under a constructive possession theory.

### D. The district court wrongly dismissed plaintiff's state law malicious prosecution claim.

In addition to his federal claims, Harris, Sr. also filed suit under North Carolina state law for malicious prosecution. Because the officers

lacked probable cause to arrest Harris, Sr.—and omitted material facts evidencing their malice—this claim should proceed to trial, too.

## CONCLUSION

Lee Harris, Sr. respectfully requests that this Court reverse the grant of summary judgment and remand for trial on all claims.

## STATEMENT REGARDING ORAL ARGUMENT

Lee Harris, Sr. respectfully requests oral argument.

Respectfully submitted,

**/s/ Abraham Rubert-Schewel**
Abraham Rubert-Schewel
Tin Fulton Walker & Owen
schewel@tinfulton.com
*Counsel for Appellant*

November 13, 2023

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 7,557 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in a 14-point, proportionally spaced typeface.

**/s/ Abraham Rubert-Schewel**
Abraham Rubert-Schewel
*Counsel for Appellant*

**CERTIFICATE OF SERVICE**

I certify that on this 13th day of November, 2023, I filed the

foregoing brief with the Clerk of Court using the CM/ECF system,

which will automatically serve electronic copies on all counsel of record.

<u>**/s/ Abraham Rubert-Schewel**</u>
Abraham Rubert-Schewel
*Counsel for Appellant*